Jeffrey NIELSEN, Plaintiff–Appellant,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, LOCAL LODGE 2569, International Association of Machinists & Aerospace Workers, AFL–CIO–CLC and Mercy Ambulance of Fort Wayne, Inc., Defendants–Appellees.

No. 95–2718.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1995.

Decided Sept. 5, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 30, 1996.

---

Glenn M. Taubman (argued), National Right to Work Legal Defense Foundation, Springfield, VA, Thomas M. Kimbrough, Barrett & McNagny, Fort Wayne, IN, for Jeffrey Nielsen.

Michael S. Huntine, Lewis & Wagner, Indianapolis, IN, Mark D. Schneider (argued), International Ass'n of Machinists and Aerospace Workers, Upper Marlbro, MD, for Intern. Ass'n of Machinists & Aerospace Workers, Local Lodge 2569 and AFL-CIO-CLC.

William T. Hopkins, Jr. (argued), Eric H.J. Stahlhut, Gallucci, Hopkins & Theisen, Fort Wayne, IN, Marjorie H. Gordon, Staci B. Walkes, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, PA, for Mercy Ambulance of Fort Wayne, Inc.

Before LAY,* CUMMINGS, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

This case presents two questions about the implementation of the Supreme Court's decision in *Communications Workers of America v. Beck,* 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), which held that § 8(a)(3) of the National Labor Relations Act authorizes unions operating with an "agency shop" agreement to exact only those fees and dues necessary to perform the duties of an exclusive representative of the employees. First, plaintiff Jeffrey Nielsen argues that a union security clause in a collective bargaining agreement is unlawful on its face unless the clause itself furnishes notice of the employees' right to become fee objectors under *Beck.* Second, he argues that the actual enforcement of the clause at issue here violated the union's duty of fair representation and was therefore unlawful. In a careful and lengthy opinion, the district court rejected both claims. We affirm.

I

Since February 1992, Nielsen has been employed as a paramedic by Mercy Ambulance of Fort Wayne, Inc. Shortly after he was hired, he joined the International Association of Machinists and Aerospace Workers (IAM International) and its Local 2569. Mercy and Local 2569 were parties to a collective bargaining agreement that included the following union security clause:

Section 1. Agency Shop:

As a condition of continued employment, all employees included within the unit de-

* Honorable Donald P. Lay, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

scribed in Article II of this Agreement shall either become a member of the Union and pay dues thereto, or in lieu thereof, shall pay an amount equal to the Union's initiation fee and shall thereafter pay to the Union each month, either directly or through payroll deduction, an amount equal to the regular monthly dues and fees in effect for other employees in the bargaining unit who are members of the Union. This obligation shall begin on the first day of the month following completion of six (6) months' employment.

Each member of the bargaining unit covered by this Agreement who has not become a member of the Union, or in lieu thereof, has not tendered the equivalent of Union dues as provided above, within seven (7) days of the first day of any month following the effective date of this Agreement or completion of his/her sixth month of employment, shall be notified by the Union by certified mail, with a copy to the Company's Director of Operations, that failure to pay either dues or agency shop fees within ten (10) days following receipt of such notice shall result in termination of employment. Should the employee fail to make such payment with [sic] the ten-day period, the Company shall, within three (3) working days after receipt of notice by certified mail from the Union, discharge such employee.

This clause was not the only union document relating to fee levels. The IAM had also implemented a procedure for employees who wanted to invoke their rights under *Beck* to limit their fees to a level that would support only core representational activities. In December of 1993, IAM International mailed a newsletter, *The Machinist*, to all employees who were required to pay dues or fees to the IAM and its locals. This publication contained a notice to employees about their financial obligations under the union security clause, and explained the procedure for becoming a "fee objector" pursuant to *Beck*. The notice began by explaining that "[e]mployees working under collective bargaining agreements containing union security clauses are required, as a condition of employment, to pay monthly dues or fees to the union. This is their sole obligation to the

union, regardless of the wording of the clauses." It then specified three different categories of employee: union members, who pay monthly dues; nonmembers, who pay an equivalent "agency fee"; and nonmember objectors, who can exempt themselves from funding expenditures that are non-germane to the collective bargaining process. After explaining some of the benefits of collective bargaining and union membership and describing what expenditures are considered germane and non-germane, the notice set forth the process by which an individual could become a fee objector.

The 1993 notice stated that there would be a "window period" between January 1 and January 31 of each year, during which an objector was entitled to request that his or her monthly agency fee payment be reduced to reflect only representational expenses. The notice also made clear that objections could also be made during the first thirty days in which an objector is required to pay fees to the union. Fee reductions were based on the audited figures from the previous fiscal year, with adjustments made near the end of the calendar year if necessary. Objectors who were dissatisfied with the final reduction had the right to file a challenge to the calculation. In that event, the notice informed its readers that there would be an "expeditious appeal" before an impartial arbitrator chosen through the American Arbitration Association's Rules. All appeals relating to the year were to be consolidated. The union was to bear the cost of the arbitration and the burden of justifying its calculations. Last, fee objectors were required to renew their request for reduction of fees on an annual basis.

Nielsen received this notice in December of 1993, but he took no action at that time. Instead, on July 5, 1994, he wrote a letter of resignation from the union to Rebecca Smith, the President of Local 2569, in which he also announced that he was invoking his rights under *Beck* to "declare [himself] protected by financial-core status." He also asked the Local to "return any reduced dues owed to [him]" and to adjust future payments accordingly. Smith responded on July 22, 1994, with a letter accepting his resignation and

informing him that he needed to address his request to become a fee objector to the General Secretary–Treasurer of IAM International, Donald Wharton. Nielsen did so in a letter of August 16, 1994, in which he again stated that he wanted to be a financial core objector in accordance with *Beck*. He specifically objected to the collection and use of his money for purposes other than direct expenses associated with collective bargaining, contract administration, and grievance processing for employees in his unit.

Wharton replied in a form letter sent on August 24, 1994, that Nielsen had not "properly perfected" his request to be a fee objector in accordance with the December 1993, guidelines because the request was not post-marked or received during the appropriate 30 day period. In November 1994, Nielsen received another dues objector notice (again in *The Machinist*) for 1995. He filed an objection for 1995 in accordance with the procedures set forth, and received the requested reduction in fees effective that year. In a sense, therefore, this case is about the marginal dues that Nielsen paid between August 1994 and December 1994, due to the union's adherence to the procedures it had established for presenting dues objections.

## II

Nielsen filed his complaint for a declaratory judgment in the district court on November 17, 1994, naming IAM International, Local 2569, and Mercy Ambulance as defendants. He alleged that his claims arose under § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), and the duty of fair representation implicit in § 9, as well as under the collective bargaining agreement between Mercy and the union. He claimed that all defendants violated § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), and the duty of fair representation, by negotiating and implementing the agency shop clause set forth above, which he asserted was facially invalid under *Beck*. He also claimed that IAM International and Local 2569 had violated the duty of fair representation by their enforcement of the union security clause.

In two orders entered on June 21, 1995, the district court concluded that IAM International and Local 2569 were entitled to summary judgment and that the action against Mercy had to be dismissed. With respect to Mercy, Nielsen conceded that the second claim for relief did not assert anything against Mercy and thus that the only question was whether a claim was stated under the first count. To the extent that the first count directly challenged the language of the collective bargaining agreement under § 8(a)(3), the court concluded that it had no jurisdiction over the claim, due to the pre-emption rule of *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). It rejected Nielsen's argument that Mercy could be sued under both *Beck* and § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), for its actions in entering into and enforcing an allegedly facially invalid contract. The court reasoned that Nielsen was trying to bring a § 301 action against the employer for negotiating and maintaining the clause—a claim within the primary jurisdiction of the NLRB. Since Nielsen did not state any claim independently cognizable under § 301 against Mercy, the court granted Mercy's motion to dismiss.

In its second order, the district court granted summary judgment to IAM International and Local 2569. It concluded that nothing in *Beck* prohibited unions from negotiating agency shop agreements, which are permitted by the first proviso to § 8(a)(3). Instead, *Beck* addressed the manner in which a union security clause could be enforced, making it clear that the maximum amount of dues an employee could be required to pay under such a clause had to correspond to core representational activities. The court found that the notice of the right to be a fee objector that appeared in *The Machinist*, which Nielsen and the other employees received, was adequate to protect their *Beck* rights. Finally, it rejected Nielsen's argument that the one-month "window period" was too restrictive. Nielsen's appeal from the final judgment entered on the basis of the June 21 orders raises three issues: (1) whether the agency shop clause was facially invalid, because it failed to indicate that the

*Beck* exception to the duty to pay full union dues or their equivalent was available; (2) whether the union was not entitled to impose the "window period" restriction on Nielsen's assertion of his *Beck* rights, either because the notice in *The Machinist* was ineffective or because the time period was too narrow; and (3) whether the district court erred in concluding that it had no jurisdiction over Mercy.

## III

Section 8(a)(3) of the NLRA makes it an unfair labor practice for an employer to discriminate in hiring, tenure, or terms of employment either to encourage or to discourage union membership. It has two provisos, the first of which is pertinent here. The first proviso essentially permits agency shop clauses in collective bargaining agreements, by stating that "nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later...." The Act also imposes duties on unions, including a statutory duty of fair representation under § 8(b). See *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967); *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991). Although the question whether a collective bargaining agreement complies with § 8(a)(3) normally falls within the NLRB's exclusive jurisdiction to rule on unfair labor practices, an exception exists when a union is accused of a breach of the duty of fair representation in a suit brought under § 301. In *Beck,* the Court held that the union could defend its representational practices by arguing that they were permitted by § 8(a)(3), and therefore that a federal court could decide the unfair labor practice issue as a matter collateral to the § 301 claim. This distinction is important, as we will see, to the respective suits against Mercy and against the two union defendants.

Although the Supreme Court had considered the rights of fee objectors in an earlier line of cases, discussed below, *Beck* was its first opportunity to consider the rights of nonmembers of a union in a private-sector company who objected to paying dues under an agency shop clause for activities unrelated to collective bargaining, contract administration, and grievance adjustment ("core representational activities"). Relying heavily on the close relationship between § 8(a)(3) of the NLRA and § 2, Eleventh of the Railway Labor Act (RLA), the Court in *Beck* concluded that a union would violate its duty of fair representation if it attempted to require employees to support union activities beyond those germane to core representational matters. The Court noted that it had reached the same result with respect to § 2, Eleventh of the RLA more than twenty-five years earlier in *Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and it stated that "[o]ur decision in *Street* ... is far more than merely instructive here: we believe it is controlling." 487 U.S. at 745, 108 S.Ct. at 2649. In light of that statement, we too look to *Street* and related decisions for guidance here.

In *Street,* the Court made clear that "the union-shop agreement itself is not unlawful" for purposes of § 2, Eleventh of the RLA. 367 U.S. at 771, 81 S.Ct. at 1801. The problem lay instead in the use of objectors' money for certain political purposes. Given the nature of the problem, it concluded that "an injunction restraining enforcement of the union-shop agreement is therefore plainly not a remedy appropriate to the violation of the Act's restriction on expenditures." *Id.* The Court also found that any remedy "would properly be granted only to employees who have made known" their objections to the union officials. *Id.* at 774, 81 S.Ct. at 1802–03. Dissent "is not to be presumed." *Id.*

Between *Street* and *Beck,* the Court revisited the question of the rights of fee objectors five times: three times in the public-sector employment context, *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), and *Lehnert v.*

*Ferris Faculty Ass'n,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), and twice under the *RLA, Brotherhood of Railway and Steamship Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963) and *Ellis v. Brotherhood of Railway, Airline and Steamship Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). In *Allen,* the first of this line of cases, the Court reiterated that dissent is not to be presumed and decided that it was enough for purposes of stating a claim for an objector to manifest his opposition to any political expenditures by the union. Those who could not prove that they had made their objection known, however, would not be entitled to relief. It also found that an injunction forbidding the union from collecting any money was too broad, because under *Street* the union could compel the payment of funds for purposes germane to collective bargaining. Finally, it held that the union would bear the burden of demonstrating which expenditures were political, and what proportion they bore to total expenditures.

*Abood* shifted the focus of attention to public-sector collective bargaining agreements. Even in that context, the Court once again declined to strike down agency shop clauses across the board. Instead, it focussed on the rights of individuals (this time under the First Amendment, because state action was involved) not to contribute to political causes to which they objected. The objective of any remedy, it stated, "must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective bargaining activities." 431 U.S. at 237, 97 S.Ct. at 1800. Reaffirming *Street's* conclusion that dissent could not be presumed, the Court found that an employee could adequately express his or her dissent by objecting to ideological expenditures of *any* sort; employees could not be required to object to each particular expenditure. The Court also suggested that the best remedy might consist of the union's adoption of internal procedures for processing fee objector claims.

*Ellis* was concerned with two procedural aspects of a union's fee objector program: a system under which the union collected the full amount of a protesting employee's dues, used the money, and paid a rebate a year later, and the union's effort to categorize certain expenditures as germane to representational activities. Notably, in *Ellis* there was no dispute about the employees' status as fee objectors; the only question was whether dues reductions had to be implemented immediately for objectors or if an after-the-fact rebate was permissible. The Court found that the rebate system was unsatisfactory, because it amounted to a forced loan from the objecting employee to the union. The Court also considered the germaneness of six categories of expenditures: conventions (yes), social activities (yes), publications (yes, as long as the charge is prorated to cover only representational materials), organizing (no), litigation (yes, but only insofar as it relates to matters like negotiating and administering the contract, settling grievances or disputes within the unit, and fair representation litigation within the unit), and death benefits (no ruling). In *Lehnert,* the Court again addressed which items could be considered germane, concluding (among other things) that it was possible in some circumstances that activities associated with state and national affiliates would be germane even if they were not performed for the direct benefit of the objecting employee's bargaining unit. 500 U.S. at 524, 111 S.Ct. at 1961–62.

In *Hudson,* the Court returned to the subject of internal procedures in the public-sector context. The Chicago Teachers Association had adopted a system under which fee objectors could obtain a rebate of the portion of their dues that was non-germane to core representational activities. It had also established an internal arbitration procedure for those who were dissatisfied with the initial adjustment. Finally, it made some efforts to inform its members of their right to object. The Court found deficiencies in all three aspects of this system and held that "the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the

amount of the fee before an impartial decision-maker, and an escrow for the amounts reasonably in dispute while such challenges are pending." 475 U.S. at 310, 106 S.Ct. at 1078.

In spite of the different statutes and contexts in which these cases have arisen, the lower courts have increasingly drawn from each line freely in considering the rights of fee objectors. Thus, for example, the procedures required in *Hudson* have come to be recognized as appropriate for *Beck* cases as well. *Abrams v. Communications Workers of America,* 59 F.3d 1373, 1377, 1380 (D.C.Cir.1995); *Kidwell v. Transportation Com. Intern. Union,* 946 F.2d 283, 294 (4th Cir.1991), *cert. denied,* 503 U.S. 1005, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992); *Crawford v. Air Line Pilots Ass'n Int'l,* 992 F.2d 1295, 1301 (4th Cir.1993). The germaneness guidance offered by the Court in *Ellis* has also been applied in private sector NLRA cases. See *Abrams,* 59 F.3d at 1377; *Kidwell,* 946 F.2d at 293–94. It is clear under *Beck* that the type of objection necessary to invoke fee objector rights is no more than that required in *Allen* and *Abood.* In our own assessment of Nielsen's claims, therefore, we draw on each of these decisions to the extent that their reasoning applies to the private sector. (We do not address the issue here whether an agency shop clause under § 8(a)(3)'s first proviso amounts to state action, thereby raising First Amendment concerns, both because the Supreme Court saw no need to go that far in *Beck* itself and because Nielsen has not argued this point.)

One final point requires brief discussion before we evaluate Nielsen's particular claims. His claims against IAM International and Local 2569 arise under the duty of fair representation contained in § 8(b)(1)(A) of the NLRA. This affects the standard of review applicable here. In *Vaca,* the Supreme Court summarized that duty as follows:

> [T]he exclusive agent's statutory duty to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise

its discretion with complete good faith and honesty, and to avoid arbitrary conduct. 386 U.S. at 177, 87 S.Ct. at 910. A breach of the duty occurs, the Court held, "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916. In *O'Neill,* a unanimous Court ruled that the *Vaca* standard "applies to all union activity, including contract negotiation." 499 U.S. at 67, 111 S.Ct. at 1130. Something would be arbitrary for these purposes, the Court explained, "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." *Id.* (internal citations omitted). This is the standard of review that governs Nielsen's claims against the union defendants.

■ We turn first to Nielsen's claim that the agency shop clause in the IAM collective bargaining agreement was facially invalid. Nielsen argued strenuously (with extensive use of exclamation points and boldface type) that the clause was invalid under § 8(a)(3) and *Beck* because the reader could conclude that no exceptions to the duty to pay full dues or their equivalent existed. According to Nielsen, *Beck* forbade the negotiation of anything other than a clause that explicitly noted that employees were only obligated to pay for core representational activities. The union defendants respond that the NLRA expressly allows the negotiation of contract clauses "requiring as a condition of employment membership" in a union, in the first proviso of § 8(a)(3), and that the second proviso also expressly provides that employers may not discharge employees pursuant to such a contractual clause for any reason other than "the failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring membership." The clause here, the union argues, does not even go as far as § 8(a)(3) would permit, because it does not require union membership. It points out that nothing in *Beck* or the statute requires the union security clause to cite every exception that might apply, including, in addition to *Beck* rights, the right to be a religious objector, the right not to pay if a union rejects the employee's

membership application, or the right to be relieved of initiation fees. Here, Nielsen obviously knew about his *Beck* rights, because he invoked them. The union asserts that nothing more is required.

Two other courts of appeals have considered the facial validity of union security clauses in the light of *Beck*: the District of Columbia Circuit and the Eighth Circuit. In *International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers (IUE) v. NLRB,* 41 F.3d 1532 (D.C.Cir. 1994), the Court of Appeals for the D.C. Circuit squarely confronted the question whether a union acted in bad faith by maintaining a union security clause that did not include notice of *Beck* rights on its face. The NLRB had found a breach of the duty of fair representation. Refusing to enforce that decision, the D.C. Circuit found "not one iota of evidence" indicating that the union's conduct was in bad faith. *Id.* at 1538. There was no evidence that the IUE had ever attempted to enforce the clause unlawfully or had tried to exact fees in excess of those permitted by *Beck* from any employee. Furthermore, the court noted, "*Beck* speaks only to the level of dues an employee may lawfully be required to pay under a union-security agreement," not to the question what language is permissible in such an agreement. *Id.* at 1539. Problems might arise only if a union were to "adopt union-security provisions of the sort at issue here without appropriate 'notice' to employees who are covered by such provisions." *Id.* at 1534. See also *Abrams,* 59 F.3d at 1378–79 (following *IUE*). In the case before it, the union did not violate its duty of fair representation, because the measures it took to assure the rights of fee objectors (including the notice it used) were "fully consistent with established law." 41 F.3d at 1534. The court found the union security clause itself to be facially valid.

The context in which the Eighth Circuit faced the facial validity issue was quite different, and thus it is not clear whether the Eighth Circuit would disagree with the D.C. Circuit if confronted with the same fact situation that was before the latter. See *Bloom v. NLRB,* 30 F.3d 1001 (8th Cir.1994). The collective bargaining agreement in *Bloom* had a standard union security clause, requiring union membership as a condition of continued employment. The employer, Group Health, accordingly withheld union dues and initiation fees from Bloom's paycheck, but it did so without his authorization. When Local 12 sent Bloom a letter asking him to complete and sign a membership application and a voluntary dues checkoff card, Bloom responded that he first wanted to review a breakdown of how union dues were spent. Local 12 gave him something indicating categories of expenditures, but it neither informed him of the percentage of dues spent on nonrepresentational activities nor did it advise him of his *Beck* rights. Bloom later filed unfair labor practices charges against both Group Health and Local 12, which were resolved in a settlement agreement. It was the adequacy of the settlement agreement that was before the Eighth Circuit.

The court decided that the settlement agreement should have required the expunction of the union security clause in these circumstances, because it had been "unlawfully interpreted and applied." *Id.* at 1005. It also noted in passing that it found the clause ambiguous, because it did not inform employees that they could not be terminated even if they did not want to be full-fledged union members, relying on the Board's decision in *IUE* that was later overturned by the D.C. Circuit. Because the union had apparently taken no steps to assure the rights of *Beck* objectors, the Eighth Circuit was not faced with the question whether a general union security clause, coupled with adequate notice or actual awareness of *Beck* rights, would have been sufficient to satisfy the duty of fair representation.

In addition to the D.C. Circuit's conclusion in *IUE* and *Abrams,* the NLRB and its General Counsel have also proceeded on the assumption that union security clauses are valid on their face. Shortly after *Beck* was decided, the *General Counsel of the Board issued Guidelines Concerning CWA v. Beck* (Memorandum GC 88–14, November 15, 1988), 1988 WL 236187 (N.L.R.B.G.C.). The section entitled "Requirements Imposed on Union" begins with the following statement:

If a union has a union-security clause covering statutory employees, and if it expends part of the funds collected thereunder on non-representational activities, that union has an obligation to notify nonmember employees: (1) that a stated percentage of funds was spent in the last accounting year for nonrepresentational activities; (2) that nonmembers can object to having their union-security payments spent on such activities; and (3) that those who object will be charged only for representational activities.

*Id.* at *1. Nothing in the Guidelines indicates that information of this detail must appear in the union security clause itself. To the contrary, it is clear both from this passage and from the remainder of the Guidelines that the General Counsel considered a separate notice both necessary and sufficient. In its recent decisions in *California Saw and Knife Works*, 320 NLRB No. 11 (Dec. 20, 1995), 1995 WL 791959 (N.L.R.B.), and *United Paperworkers International Union*, 320 NLRB No. 12 (Dec. 20, 1995), 1995 WL 791957 (N.L.R.B.), the Board discussed the separate issue of the adequacy of the implementation of a *Beck* policy. It did not, however, cast any doubt on the facial validity of a general union security clause like the one we have here.

We agree with the D.C. Circuit and the NLRB that *Beck* did not, either explicitly or implicitly, call into question the facial validity of union security clauses. Dissent, as the Supreme Court has repeatedly noted, is not to be presumed. See *Street, Allen,* and *Abood, supra.* Under *Beck*, the critical questions instead are whether the union is spending money on activities going beyond the scope of core representational matters, and if it is, how the union is assuring that the rights of potential fee objectors will be respected. Because the Eighth Circuit was not presented with an alternative mechanism for assuring those rights in the *Bloom* case, it is unclear at best whether it would find that only a modification of the union security clause itself would suffice to protect objecting employees. (In our view, therefore, the district court in Minnesota may have over-read *Bloom* in its decision in *Schreier v. Beverly California Corp.,* 892 F.Supp. 225 (D.Minn.

1995), when it concluded that the Eighth Circuit rule squarely forbids unqualified union security clauses.) In this case, as in *IUE*, there is no evidence whatever that the union acted arbitrarily, discriminatorily, or in bad faith, within the meaning of *Vaca* and *O'Neill,* when it negotiated the agency shop clause applicable to Local 2569 members. In the absence of such evidence, it does not violate a union's duty of fair representation to have such a clause in a collective bargaining agreement. We therefore reject Nielsen's argument of facial invalidity and turn to his more particularized arguments regarding the implementation of this clause.

Nielsen argues that two problems are presented by IAM International's application of its union security clause in this case. (We note that he does not mention Local 2569 in this respect. It thus appears to be undisputed that Local 2569 would not be liable in any event under his implementation theories.) First, he claims that the notice of his right to be a fee objector "is sent in a manner which discourages employees from actually seeing it," and second, he claims that IAM International has no power to restrict his assertion of his *Beck* rights to a one-month "window period." We address these claims in turn.

The district court found that Nielsen himself received both the December 1993 notice and the November 1994 notice in *The Machinist*. In his brief to this Court, Nielsen concedes that he "is on the subscription list and receives … *The Machinist.*" Appellant's Brief at 7. We therefore do not have a case of either a new employee or an employee who raised a genuine issue of fact about actual receipt of notice. Upon its own review of an actual copy of the December 1993 notice, the district court found "that the notice is well-marked, as it is listed in the table of contents on the second page, and is printed in legible type and highlighted in green on the seventh page. (The entire magazine is only eight pages in length.)" We, too, have reviewed the notice, and we agree with that characterization.

In *California Saw & Knife Works*, the NLRB found that both the form and content of the notice in *The Machinist* was "sufficient

to satisfy the union's obligation under the duty of fair representation to notify nonmembers of their rights under *Beck*." 320 NLRB No. 11 at 12, 1995 WL 791959, *13 (NLRB). It specifically found that the system of mailing notice to all represented employees, which IAM International used here as well, fell within the "wide range of reasonableness" permitted to a union under the duty of fair representation. *Id.* The district court in Nielsen's case came to the same conclusion, and again, we agree. Accordingly, we find that IAM International did not violate its duty of fair representation to Nielsen when it informed him of its *Beck* policy through the notice that appeared in *The Machinist*.

■ The last issue relating to IAM International relates to the "window period" for making one's *Beck* objections known. As noted above, Nielsen received notice of his *Beck* rights in December 1993 and did not file an objection during the January 1994 filing period. Instead, he waited until July 1994, when he first notified Local 2569 of his desires, and then, after President Smith informed him that he needed to contact IAM International directly, he did so on August 16, 1994. The question here is therefore a straightforward one: does a union violate its duty of fair representation when it establishes a one-month "window period" for the invocation of *Beck* rights?

The union argues that the "window period" is a reasonable administrative device that helps the union to process its dues objector claims and to keep its annual budget straight. The district court noted that without the limited time period for filing and processing objections, the program would be unworkable:

> Each annual objection necessitates revisions in the records of three organizations, each of which is entitled to a percentage of the fees which must be reduced: the local union, the intermediate union or district lodge, and the International Union. Objections can potentially come from any of the 1300 local unions, representing approximately 500,000 employees, and currently it costs IAM over $200,000.00 to operate its dues reduction system. Under the IAM

procedures, each objector has an opportunity to challenge the fee reduction calculation in a union-funded arbitration procedure.

The costs of administration would plainly be higher if the union were required to handle objections on a rolling basis throughout the year. Furthermore, such a system would make it somewhat more difficult to create an annual budget for the non-representational activities of the union, because the revenue side of the balance book would always be in doubt. In a similar situation, this Court refused to order restitution in a case challenging the deduction of a public union's fee, because an after-the-fact deduction might embarrass the union financially. See *Gilpin v. American Federation of State, County, and Municipal Employees*, 875 F.2d 1310, 1313 (7th Cir.1989).

We see nothing in *Ellis* or *Hudson*, which forbade the use of rebate systems for employees who had validly registered their fee objections, that casts doubt on the use of a "window period." If the union already knows that a certain number of employees are fee objectors, as was the case in *Ellis* and *Hudson*, then it has no right to collect monies from those employees notwithstanding their objections, and rebate the sums a year later. Nielsen's case is different, because it presents the threshold question of how and when one can become a fee objector. Nothing in the NLRA or in *Beck* confers a right to instantaneous action, regardless of the administrative burden the union might bear in implementing these requests.

It is not unreasonable for a union to require existing members or full fee nonmembers to voice their objections in a timely fashion, and to be aware that the price of not doing so will be to wait at most ten or eleven months before implementing their new status. Life is full of deadlines, and we see nothing particularly onerous about this one. When people miss the deadline for filing an appeal to this Court, their rights can be lost forever, not just for eleven months, but that does not make time limits for filing appeals in violation of the law. Other courts that have considered "window periods" have come to the same conclusion. See *Abrams*, 59

F.3d at 1381–82; *Tierney v. City of Toledo,* 824 F.2d 1497, 1506 (6th Cir.1987) (requiring non-union members to object by January 31 of a given year permissible if the union makes appropriate disclosures before objections must be made); *Andrews v. Education Ass'n of Cheshire,* 653 F.Supp. 1373, 1378 (D.Conn.1987), *aff'd,* 829 F.2d 335 (2d Cir. 1987); *Kidwell v. Transportation Communications Int'l Union,* 731 F.Supp. 192, 205 (D.Md.1990), *aff'd. in part and rev'd in part on other grounds,* 946 F.2d 283 (4th Cir. 1991), *cert. denied,* 503 U.S. 1005, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992).

The Board's position in this respect has been inconsistent. In the *General Counsel's Guidelines Concerning CWA v. Beck,* it stated clearly that "if the union has a 'time window' for filing objections, the notice must set forth that information and the time period must be reasonable." 1988 WL 236187 at *2. The obvious implication of this statement is that at least some "window periods" are permissible. In its more recent decision in *California Saw and Knife Works,* however, the Board found that the IAM's January "window period" operated as an arbitrary restriction on the right to be free to resign from union membership and thus violated the duty of fair representation. 320 NLRB No. 11, at 13, 1995 WL 791959 at *15. The Board's position in *California Saw and Knife,* however, gives no weight at all to the union's legitimate administrative needs—indeed, it almost requires the union to find the system that imposes the least restriction on *Beck* rights possible. Such exacting scrutiny is inconsistent with *Vaca* and *O'Neill,* which require us to uphold the union's actions as long as they fall within a generous range of reasonableness. Because the IAM has offered valid administrative justifications for its system here, we conclude that it has not violated its duty of fair representation by imposing an annual "window period" for registering fee objections.

Last, we review the district court's dismissal of the action against Mercy. Unlike the case against IAM International and Local 2569, the action against Mercy directly challenges the validity of the agency shop clause in the collective bargaining agreement as an unfair labor practice. There is no claim that Mercy breached the agreement as written, nor is there a claim that Mercy itself owed a duty of fair representation to Nielsen. Thus, this is not the kind of suit under § 301 of the LMRA, 29 U.S.C. § 185(a), that can be brought against Mercy. Put differently, in spite of Nielsen's effort to characterize his § 8(a)(3) claim against Mercy as "collateral," and thus cognizable in a § 301 suit, the problem is that it is not collateral to anything cognizable under § 301. Instead, Nielsen's request for a declaration that the union security clause is "facially invalid and void under the National Labor Relations Act" is the kind of claim that the Supreme Court has ruled must be brought before the Board. See *Beck,* 487 U.S. at 742, 108 S.Ct. at 2647; *Garmon,* 359 U.S. at 244–45, 79 S.Ct. at 779–80. The district court therefore properly granted Mercy's motion to dismiss.

For the foregoing reasons, we AFFIRM the judgment of the district court in its entirety.