IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-10490

---

ELIZABETH A. SHEA, ET AL.,

                                        Plaintiffs,

ELIZABETH A. SHEA; JAN CHRISTY;
PEGGY GALLERANI; VICTOR GARZA;
NORMA KUNZLER; JOSEPHINE MORTON;
DEBBIE NICKELL; DONNA ROZENBURG;
JAMIE SELVA,

                                        Plaintiffs-Appellants,

        versus

INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, an unincorporated
association,

                                        Defendant-Appellee.

---

Appeal from the United States District Court for the
Northern District of Texas

---

September 14, 1998

Before GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiffs-appellants (Appellants) are Southwest Airlines (Southwest) customer service agents who are represented by the defendant-appellee International Association of Machinists and Aerospace Workers (IAM) pursuant to a union shop agreement. Appellants contend that the IAM's annual objection requirement, whereby an employee can opt out of full union membership only if he

notifies the union in writing every year, violates their rights under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (RLA). The district court granted summary judgment in favor of the IAM, finding that the IAM's procedures do not violate the union's duty of fair representation. We disagree with the district court, and reverse the grant of summary judgment.

## Facts and Proceedings Below

Because Southwest is a "carrier by air," its labor relations are governed by the RLA. *See* 45 U.S.C. § 181. Under Section 2, Eleventh of the RLA, an employer and a union can enter into "union shop agreements" whereby all employees must become members of the union as a condition of continued employment. *See* 45 U.S.C. § 152, Eleventh. Pursuant to this section, Southwest and the IAM entered into such an agreement, which is included as a union security clause in their collective bargaining agreement. This union security clause requires that the Southwest employees who are represented by the union either become members of the union or financially support the union as a condition of continued employment by Southwest.

Appellants chose not to become members of the union, but, in accordance with the union shop agreement, they paid an agency fee to the union for their *pro rata* share of the expenses incurred by the union in providing representational services to the employees.

The current dispute between the IAM and the appellants concerns the IAM's objection procedures, that is, the procedures by which employees are required to notify the union that they will not

2

become members and will only pay the objector fee. The IAM's objection procedure requires that the objectors provide the IAM with written notice during a 30-day window period every year. The IAM does not honor written (or other) "continuing objections," and thus the objector must renew his written objection every year or he will be obligated to pay full union dues. The sole issue before this Court is whether the annual objection renewal requirement is permissible as applied to written continuing objections.

As a reminder of this annual objection requirement, the IAM publishes a notice to its dues objectors in its newsletter, "The Machinist." From 1990 through 1993, the notice was published in the December issue of "The Machinist," reminding the objectors to renew their objection during the upcoming January 30-day window period. "The Machinist" was not published in December of 1994, so the notice for the 1995 year was printed in the November 1994 issue.

The IAM maintains a database to keep track of employees and designates them as "members," "nonmember agency fee payors," or "objecting nonmember agency fee payors." An employee who objects is designated as an "objecting nonmember agency fee payor." If that employee renews his objection the following year, he remains an "objecting nonmember agency fee payor"; if he fails to object, however, he is redesignated as a "nonmember agency fee payor." If a new employee does not object to becoming a member of the union, he is automatically designated a "member," and he does not have to provide any notice to renew his membership.

3

The purpose of the database is to allocate the union's annual expenses as "chargeable" and "non-chargeable." An objecting member is not required to fund the "non-chargeable" expenses because they are not related to the union's representational services. Many of these non-chargeable expenses have been defined by the Supreme Court, and include expenses for political activities and other activities that are not related to collective bargaining. According to the IAM, the costs of collective bargaining and other activities are allocated among the members and nonmembers every year, and an amount is determined that fee objectors must pay for the following year. All employees are then sent a notice that indicates what percentage of their dues were spent on collective bargaining activities, the reduced amount which must be paid by fee objectors, and the requirements for becoming/remaining fee objectors.

All nine appellants filed objections in 1990, 1991, and 1992, but only five filed objections in 1993. None of the appellants' objections were received by the IAM during the 1994 window period. The reason for this was that the IAM had moved its headquarters two years earlier. The address of the new headquarters was listed in the annual notice, but appellants, who did not then realize this, continued to mail their objections to the old address. By January of 1994 the forwarding order had expired and the objection letters were returned to appellants. Upon receiving the returned objections, appellants resubmitted their objections to the correct address after the window period had ended, but these objections

4

were rejected by the IAM as untimely. Because they did not file objections during the required window period, the appellants became obligated to pay an agency fee that was equivalent to full union dues; the reduced annual agency fee for an "objecting nonmember agency fee payor" would have been approximately $42 less than the full fee.

In order to avoid this liability for full dues, appellants relied on written "continuing objections" to any noncollective bargaining related expenditures that they had filed in earlier years. Since 1989, each of the appellants had filed at least one such written objection that contained the statement, "the objection is to be considered as a continuing objection and remain in force from year-to-year until canceled by me." The IAM, however, does not recognize continuing objections, and instead requires objectors to renew their objections annually.

Appellants challenged this annual renewal requirement, arguing that their written continuing objections ought to be recognized and honored. The district court rejected this argument and granted the IAM's motion for summary judgment and dismissed the case. The district court applied the Duty of Fair Representation standard (DFR standard) and held that neither the thirty-day window period nor the annual renewal requirement violated the IAM's duty to fairly represent the interests of all employees in its collective bargaining unit.

## Discussion

In 1934, Congress made major revisions to the Railway Labor Act of 1926 that significantly strengthened the position of the union towards the carrier. One important revision was that the union selected by a majority of employees in the bargaining unit was deemed the exclusive bargaining agent of *all* those employees, regardless of whether they were union members. 45 U.S.C. § 152, Ninth. On its face, this provision of the RLA requires only that this exclusive bargaining agent act on behalf of all employees, but it does not explicitly require that the exclusive bargaining agent act equitably toward all employees. There is thus no explicit statutory directive that the union fairly represent the minority interests of certain classes of employees. To curb abuses, the courts created a duty of fair representation. This judicially created duty of fair representation dictates that the exclusive bargaining agent has the duty not to just represent all employees, but to represent them equitably and fairly, regardless of their class, or whether they are union members. *See generally* 2 *The Developing Labor Law* 1409 (Patrick Hardin, ed., 3d ed. 1992).

This duty of fair representation was first announced in *Steele v. Louisville & Nashville R.R.*, 65 S.Ct. 226 (1944), where the Supreme Court held that a union could not exercise its statutory power as exclusive bargaining representative in a manner that discriminated against employees who were not, and could not become, union members because of their race. The *Steele* Court reasoned that when Congress conferred exclusive representative bargaining

6

power on the union, it implicitly created a duty to act fairly toward all employees. *See Steele*, 65 S.Ct. at 232 (1944) (finding that the RLA implicitly "expresses the aim of Congress to impose on the bargaining representative of a craft or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts without hostile discrimination against them."). The Court further held that if the duty of fair representation was violated, an individual union member could seek "the usual judicial remedies of injunction and award of damages . . . ." *Id.* at 234.[1] In *Vaca v. Sipes*, 87 S.Ct. 903 (1967), the Supreme Court specifically defined the DFR standard. The Court stated that a union breaches its duty of fair representation when its actions are "arbitrary, discriminatory, or in bad faith." *Id.* at 916.

*Steele* created the duty of fair representation in the context of a racially discriminatory union that did not allow black employees to become union members. The duty of fair representation, however, was not limited to racially discriminatory unions, rather the Court imposed the duty on all unions to fairly

---

[1]   Together with *Steele*, the Court announced in a companion case, *Tunstall v. Brotherhood of Locomotive Firemen and Enginemen*, 65 S.Ct. 235 (1944), that the right to be represented without discrimination was a federal right, and in *Wallace Corp. v. NLRB*, 65 S.Ct. 238 (1944), issued the same day, the Court reiterated the duty to represent the employees' interests fairly. Following these three cases, the Court reaffirmed the duty of fair representation in the exclusive bargaining context several times over the next several decades. *See Ford Motor Co. v. Huffman*, 73 S.Ct. 681 (1953); *Syres v. Oil, Chemical & Atomic Workers Local 23*, 76 S.Ct. 152 (1955); *Humphrey v. Moore*, 84 S.Ct. 363 (1964); *see generally* 2 *The Developing Labor Law* 1411-12 (Patrick Hardin, ed., 3d ed. 1992).

represent all union and nonunion employees regardless of why certain employees were not union members. Under the duty of fair representation, employees are entitled to fair representation by the union whether they were barred from joining the union based on their race or whether they voluntarily chose not to join. Thus, an individual who voluntarily did not join the union could gain all the benefits and advantages of the union's bargaining activities at no cost to him since he was under no obligation to financially support the union. *See Communications Workers of America v. Beck*, 108 S.Ct. 2641, 2649 (1988). This situation put an unfair financial burden on the union and its members since the unions were legally obliged to fairly represent and act on behalf of all employees, but could only look to union members for financial support. By 1951, Congress had become concerned with the so-called "free-riders," and amended the RLA. *See International Ass'n of Machinists v. Street*, 81 S.Ct. 1784, 1798 (1961) (quoting from the House Hearings where George H. Harrison, representing the Railway Labor Executives' Association stated: "It is submitted that this bill with the amendment . . . makes possible the elimination of the 'free rider' and the sharing of the burden of maintenance by all of the beneficiaries of union activity.")

To curb the "free-rider" problem, Congress enacted section 2, Eleventh, which authorized the union shop. Under the union shop, employees could be compelled by their employer to contribute to the exclusive bargaining representative as a condition of employment. This compulsory unionism would guarantee that those who enjoyed the

benefits of collective bargaining agreements negotiated by the union would share in the costs of collective bargaining. *See id.*

On its face, section 2, Eleventh does not merely require that all employees contribute to the union's collective bargaining expenses, rather it requires that all employees become *members* of the union. In other words, its literal language seems to require that employees pay full union dues, and thereby financially support not only the union's collective bargaining, but all of its political and other activities as well. This forced membership, through which an employee could be forced to financially support political (or other) causes which he opposes, gave rise to concerns over First Amendment rights of free speech and association.[2] In the seminal case on the matter, *International Assoc. of Machinists v. Street*, 81 S.Ct. 1784 (1961), the Supreme Court construed section 2, Eleventh to deny the union the power to use an employee's funds for political causes if the employee objects and makes his objection known to the union. *Id.* at 1800.

The railway employees in *Street* argued that section 2, Eleventh was unconstitutional because it permitted the unions to use the employees' funds for political activities that they disagreed with. The Court upheld the statute, but construed

_____

[2] The Court has found that there is sufficient state action to implicate the First Amendment in RLA cases because the RLA expressly states that it supersedes state law, and hence federal law is the authority through which private rights are lost. *See Railway Employees' Dep't v. Hanson*, 76 S.Ct. 714, 718 (1956) ("The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction.").

section 2, Eleventh to avoid finding it unconstitutional. The Court relied on the principle that, wherever possible, federal statutes must be interpreted to avoid constitutional questions. *See Street*, 81 S.Ct. at 1790, *citing Crowell v. Benson*, 52 S.Ct. 285, 296 (1932). In keeping with this principle, the Court held that Congress did not intend "to provide the unions with a means for forcing employees, over their objection, to support political causes which they oppose." *Street*, 81 S.Ct at 1797-98. The legislative history supports this interpretation and reveals that although Congress did not explicitly protect the free speech rights of objecting employees, Congress was concerned with protecting the rights of those who would be subject to union shop agreements. *See id.* at 1798-99 (quoting extensively from the legislative history). Based on this legislative history, the *Street* Court found that free speech protection was implicit in the statute and that under section 2, Eleventh an employee cannot be forced to contribute to a union's political activities if he makes his objection known. *See id.* at 1803 (holding that "dissent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee."). Thus, after *Street*, a union could lawfully enforce a union shop agreement and collect full dues from all employees who did not let their objections be known.

At the heart of the *Street* opinion was the concern over the employees' First Amendment rights under a union shop agreement. This concern over the First Amendment rights of objecting employees continues to shape the evolving union shop jurisprudence.

10

In *Railway Clerks v. Allen*, 83 S.Ct. 1158 (1963), the Court was presented with an issue similar to the issue in *Street*. The *Allen* plaintiffs challenged the union shop agreement on the grounds that money was being exacted from employees and spent on political activities. The *Allen* Court relied on *Street* and basically reiterated the holding of *Street* that section 2, Eleventh must be construed to deny the unions the power to use an employee's exacted funds for political causes that the employee opposes if the employee makes his objection known. In another RLA case, *Ellis v. Railway Clerks*, 104 S.Ct. 1883 (1984), the Court expanded upon the rights established by *Street* and set limits on what expenses could be charged to objecting nonunion employees and how those charges could be assessed.

The Supreme Court also dealt with the union shop outside the RLA context. The National Labor Relations Act (NLRA) for example, also contains a union shop provision, which the Court interpreted in *Communications Workers v. Beck*, 108 S.Ct. 2641 (1988). The *Beck* Court held that the union shop provisions of the NLRA and RLA have the same meaning. Unlike the RLA cases, the Court did not explicitly invoke the First Amendment, but it did rely on *Street*, which construed the union shop provision of the RLA to avoid conflicts with the First Amendment. Following *Street*, the Court concluded that the union shop provision of the NLRA, like its counterpart in the RLA, only allows unions to collect fees necessary for collective bargaining. *Id.* at 2657.

In another line of cases involving public employee unions and state union shop laws, the Supreme Court explicitly relied on the First Amendment. In *Abood v. Detroit Bd. of Educ.*, 97 S.Ct. 1782 (1977), the Court was called upon to decide the constitutionality of a Michigan union shop law. The Court upheld the law, but following *Street* and *Allen*, limited it so that objecting nonunion employees did not have to pay for political (or other nongermane) activities. The Court noted that requiring nonunion employees to support their collective bargaining agent "has an impact upon their First Amendment interests." *Id.* at 1793. Because of these interests, the Court sought to minimize the burden on the objecting employee without restricting the union's ability to recover its collective bargaining expenses. *Id.* at 1800. The Court held that broadly objecting to *any* ideological expenditures unrelated to collective bargaining was sufficient and the burden would then lie with the union to apportion its expenses between those related to collective bargaining and all others. The Court stated:

> "As in *Allen*, the employees here indicated in their pleadings that they opposed ideological expenditures of *any* sort that are unrelated to collective bargaining. To require greater specificity would confront an individual employee with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public disclosure. It would also place on each employee the considerable burden of monitoring all of the numerous and shifting expenditures made by the Union that are unrelated to its duties as exclusive bargaining representative." *Id.* at 1802-03.[3]

---

[3]    It should be noted that *Street*'s objection requirement was imposed in a context which appeared to assume that a nonmember employee in the bargaining unit could only object to expenditures on specific, particular activities not germane to collective

12

This same emphasis on minimizing the interference with the objecting employee's free speech rights was reiterated in another state law case, *Chicago Teachers Union v. Hudson*, 106 S.Ct. 1066 (1986). The *Hudson* Court recognized that:

> "although the government interest in labor peace is strong enough to support an 'agency shop' notwithstanding its limited infringement on nonunion employees' constitutional rights, the fact that those rights are protected by the First Amendment requires that *the procedure be carefully tailored to minimize the infringement*." *Id.* at 1074 (emphasis added).

We hold that this requirement that "the procedure be carefully tailored to minimize the infringement" is the standard by which

---

bargaining of which he disapproved. That specificity requirement was effectively done away with in *Allen*. As the Court explained in *Abood* (97 S.Ct. at 1801 & n.39):

> "The Court [in *Allen*] held that the employees had adequately established their cause of action by manifesting 'opposition to *any* political expenditures by the union,' *id.*, at 118, 83 S.Ct., at 1162 (emphasis in original), and that the requirement in *Street* that dissent be affirmatively indicated was satisfied by the allegations in the complaint that was filed, 373 U.S., at 118-119, and n. 6, 83 S.Ct., at 1161-62.[39]

> **39.** *Allen* can be viewed as a relaxation of the conditions established in *Street* governing eligibility for relief. See *Allen*, 373 U.S., at 129-131, 83 S.Ct. at 1167-1168 (Harlan, J., concurring in part and dissenting in part). *Street* seemed to imply that an employee would be required to identify the *particular* causes which he opposed. 367 U.S., at 774-755, 81 S.Ct., at 1802-03. Any such implication was clearly disapproved in *Allen*, and, as explained today, see *infra*, at 1802, there are strong reasons for preferring the approach of *Allen*."

It is clear, then, that subsequent cases have *relaxed* the *Street* objection requirement. That requirement, of course, still exists, but at least since *Abood* it is clear that there is no legal reason to require more than a written, continuing objection to all expenditures or activities not germane to collective bargaining.

13

union shop procedures of the kind at issue here must be evaluated under the RLA.

The objection procedure at issue in this case fails to meet the *Hudson* standard; it does not minimize the infringement. The current procedure is cumbersome to both the union and the objecting employees because it requires annual computer entries. If the IAM recognized continuing objections made expressly and in writing, the employee would notify the union only once and neither the union nor the individual would be bothered with annual database entries.

The IAM has not proffered any legitimate reason why an annual written objection requirement is necessary when the employee has previously furnished (and not withdrawn) a continuing written objection. It seems to us that the unduly cumbersome annual objection requirement is designed to prevent employees from exercising their constitutionally-based right of objection, and serves only to further the illegitimate interest of the IMA in collecting full dues from nonmembers who would not willingly pay more than the portion allocable to activities germane to collective bargaining. Certainly the procedure that least interferes with an employee's exercise of his First Amendment rights is the procedure by which an employee can object in writing on a continuing basis. As demonstrated by this case, the current annual objection procedure can interfere with an employee's exercise of his rights, because if he fails to again object, he must pay the equivalent of full union dues and thereby support the union's political

14

activities.[4]  If the IAM could bring forth a legitimate reason why written objections must be annually renewed and cannot be continuing, then perhaps we would have to evaluate whether the infringement is reasonably necessary.  But in the absence of such a reason, we hold that the annual written objection procedure is an unnecessary and arbitrary interference with the employees' exercise of their First Amendment rights.

Our holding today is in conflict with the holdings of the D.C. and Sixth Circuits, which both upheld the annual objection requirement.  In *Tierney v. City of Toledo*, 824 F.2d 1497, 1506 (6th Cir. 1987), the court held that the union's annual objection requirement is not unreasonable.  To reach this conclusion, the court merely noted that *Hudson* had placed the burden of objection on the employee, and from this the court leaped to the conclusion that because the burden was on the employee, the annual objection procedure was not unreasonable.  Only a single, brief sentence of the *Tierney* opinion is devoted to this issue.  We disagree with *Tierney's* logic, and can see no basis for concluding that because the employee bears the burden of objection, he must object annually.  The burden of objection was first placed upon the employee by *Street*, which held that an employee's objection "must

---

[4]     There is nothing to suggest that not requiring that written objections be annually renewed would result in any nonmember employee within the bargaining unit who had filed a written objection being classified in a subsequent year as an objector when he was then in fact willing to pay full dues.  Nor is there anything to suggest that requiring written objections to be annually renewed was less costly or more efficient from a bookkeeping or administrative perspective.

15

affirmatively be made known to the union by the dissenting employee." *Street*, 81 S.Ct. at 1803. Under our reading of *Street* and the cases that followed, however, the Court was primarily concerned with protecting the employees' First Amendment rights and minimizing the infringement on those rights. Nothing in those cases requires *repeated* objection. *Tierney*'s reliance on *Hudson* is therefore misplaced. Although *Hudson*, like *Street*, placed the burden of objection on the employee, the Court also required that the objection procedure be "*carefully* tailored to *minimize* the infringement." *Hudson*, 106 S.Ct. at 1074 (emphasis added). In light of this latter requirement, we cannot agree with *Tierney* that the annual objection procedure for which there is a less burdensome, more logical alternative is "reasonable."

We also disagree with the D.C. Circuit, which held in *Abrams v. Communications Workers of America*, 59 F.3d 1373, 1381-82 (D.C. Cir. 1995), that in light of *Street's* directive that the employee must make his objection known, the annual objection requirement was permissible. *Abrams* devotes only two sentences to this issue and merely cites *Street* and *Tierney*. For the reasons stated above, we do not agree with *Abrams* in this respect.[5]

---

[5] Another case, *Kidwell v. Transportation Communications International Union*, 731 F.Supp. 192, 205 (D.Md. 1990), *aff'd in part, rev'd in part on other grounds* 946 F.2d 283 (4th Cir. 1991), followed the logic of *Tierney* and held that the annual renewal requirement is "not unduly restrictive of plaintiffs' rights" and that it is a reasonable requirement "since objections are not to be presumed." The *Kidwell* court held that "the union is not required to provide the least restrictive procedure imaginable." If the "imaginable" in this statement is replaced by "reasonably practicable," then the statement would be contrary to *Hudson*. We impose no obligation on the Union that is not reasonably

16

The plaintiffs in *Abrams* alleged that the objection procedure violated the union's duty of fair representation. The *Abrams* court did not explicitly base its holding on the DFR, but other courts have. In *Nielsen v. International Ass'n of Machinists and Aerospace Workers*, 94 F.3d 1107, 1113 (7th Cir. 1996), for example, the Seventh Circuit held that the DFR standard was the appropriate standard for reviewing the procedures related to the union shop agreement under the NLRA. The court was not presented with the issue of an annual renewal requirement, but it did conclude that the union had not violated its duty of fair representation by imposing a window period for registering objections. In support of its holding that the DFR standard applied, the *Nielsen* court cited *Airline Pilots Ass'n v. O'Neill*, which held that the DFR standard announced in *Vaca v. Sipes* "applies to *all* union activity, including contract negotiation." *Airline Pilots Ass'n v. O'Neill*, 111 S.Ct. 1127, 1130 (1991) (emphasis added). In another union shop case decided under the NLRA, the National Labor Relations Board held that "[i]n light of the Court's explicit directive [in *Vaca* and *O'Neill*] that the duty of fair representation applies to all union activity, we find inescapable the conclusion that a union's obligations under *Beck* are to be measured by that standard." *California Saw & Knife Works*, 320 NLRB 224 (1995).[6]

---

practicable, and we disagree with *Kidwell*.

[6] The annual renewal requirement was not before the NLRB in *California Saw & Knife Works*.

17

Both *Nielsen* and *California Saw & Knife Works* are distinguishable from the current case because they were decided under the NLRA. Some Supreme Court decisions may have arguably indicated that under the NLRA there is not sufficient state action to trigger constitutional protections. *See Communications Workers of America v. Beck*, 108 S.Ct. 2641, 2656-57 (1988) (citing *Steelworkers v. Sadlowski*, 102 S.Ct. 2339, 2350 n.16 (1982), and *Steelworkers v. Weber*, 99 S.Ct. 2721, 2725 (1979)). *Beck* left that issue open. *Id.* at 2657 ("We need not decide whether the exercise of rights permitted, though not compelled, by § 8(a)(3) involves state action."). The NLRA, unlike the RLA, preserves the authority of states to outlaw union shop agreements, and thus it may be arguable that there is no constitutional question and that courts deciding NLRA cases cannot directly invoke the *Hudson* First Amendment standard. But the case before us arises under the RLA, which preempts state laws that ban union shop agreements, and this preemption has been held to be sufficient governmental action to trigger constitutional limitations. *See Beck*, 108 S.Ct. at 2656-57; *Railway Employees v. Hanson*, 76 S.Ct. 714 (1956). Because the RLA is subject to constitutional limits, a reviewing court may properly invoke the protections of the First Amendment and need not rely on the arguably weaker DFR standard. For this reason we apply the *Hudson* First Amendment standard rather than the DFR standard.

The district court in this case, however, did not follow *Hudson*, and instead reviewed the objection procedures under the DFR standard. Under the DFR, the court found that the objection

18

procedure must be upheld because it is not arbitrary, discriminatory, or in bad faith towards the objecting nonunion employees. The lower court's reliance on the DFR standard is misplaced. First, the DFR standard is not the appropriate standard of review in this case, and second, even if the DFR were the appropriate standard, the annual objection requirement violates it.

Since the union can give no justification for this annual objection procedure, and since it is more cumbersome and less efficient than a system that allows continuing written general objections, the procedure is unreasonable and arbitrary. It is an unnecessary and arbitrary interference with the employees' First Amendment rights that fails to meet the union's duty of fair representation as it has been defined in *Vaca* and *O'Neill*. *See Vaca v. Sipes,* 87 S.Ct. 903 (1967); *see also O'Neill*, 111 S.Ct. at 1136 (1991) (a breach of the duty of fair representation occurs only if the union's actions "can be fairly characterized as so far outside of a 'wide range of reasonableness,' that it is wholly 'irrational' or 'arbitrary.'" (citations omitted)).

More fundamentally, we remain unconvinced that the union's objection procedures should even be reviewed under the DFR standard. Even though other union shop cases have been decided under the DFR, we will not apply the DFR standard in this case.

The DFR standard is applicable to evaluate a union's treatment of its members and represented nonmembers in the context of a collective bargaining agreement, that is, when a union is performing traditional representational union functions on behalf

19

of those that it represents. Issues such as the administration of the collective bargaining agreement, the fairness of the IAM's representation of the employees in negotiations with the employer, or how a union treats those that it represents, are susceptible to DFR review. A highly deferential standard of review is appropriate in those cases because the court is being called upon to review the union's performance of union functions and should not substitute its own judgment of how a union should conduct its affairs. *Cf*. *O'Neill*, 111 S.Ct. at 1135 (1991) ("Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." (citations omitted)). To avoid over-reaching, courts must give great leeway to unions in cases concerning such disputes. But, this is a dispute between the union and the objecting employees that does not require us to second-guess the union's judgment as exclusive bargaining representative. Rather we are called upon to protect the free speech rights of objecting employees from intrusive union procedures. The free speech rights whose protection is at issue here lie at or near "the core" of the First Amendment. *See Boos v.*

*Barry*, 108 S.Ct. 1157, 1162 (1988); *Abood*.[7]  In this character of case, we will follow *Hudson* and require a union to adopt those reasonably practicable procedures that least interfere with an objecting employee's exercise of his First Amendment rights.

We hold that the IAM's procedure violates *Hudson's* requirement that the First Amendment infringement be minimized.  Alternatively, we hold that the annual objection requirement violates the IAM's duty of fair representation.  For these reasons, we reverse the district court's grant of summary judgment and remand for further proceedings.

REVERSED and REMANDED

---

[7]     As the Court stated in *Abood*:

"It is no doubt true that a central purpose of the First Amendment '"was to protect the free discussion of governmental affairs.'"  . . . [citations] But our cases have never suggested that expression about philosophical social, artistic, economic, literary, or ethical matters—to take a nonexhaustive list of labels—is not entitled to full First Amendment protection."  *Id*. at 1797 (footnote omitted).