**INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, et al., Petitioners, Cross–Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner,**

**Alan Strang, et al., Intervenors.**

**Nos. 96–1246, 96–2928 and 96–3467.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1997.

Decided Jan. 14, 1998.

Laurence Gold (argued), Bredhoff & Kaiser, Washington, DC, Allison Beck, Mark D. Schneider, International Association of Machinist and Aerospace Workers, Upper Marlbro, MD, James B. Coppess, AFL–CIO, Washington, DC, for Petitioners/Cross–Respondents in No. 96–1246.

Laurence Gold (argued), Bredhoff & Kaiser, Washington, DC, Allison Beck, Mark D. Schneider, International Association of Machinist and Aerospace Workers, Upper Marlbro, MD, for Petitioners/Cross–Respondents in No. 96–2928.

Laurence Gold (argued), Bredhoff & Kaiser, Washinton, DC, David Rosenfeld, Vanbourg, Weinberg, Roger & Rosenfeld, Oakland, CA, Allison Beck, Mark D. Schneider, International Association of Machinist and Aerospace Workers, Upper Marlbro, MD, Greg Adler, Livingston, Adler & Pulda, Hartford, CT, for Petitioners/Cross–Respondents in No. 96–3467.

Aileen A. Armstrong, Frederick Havard, Fred L. Cornnell, Jr. (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Michael Marcionese, National Labor Relations board, Region 34, Hartford, CT, for Respondent/Cross–Petitioner in No. 96–1246.

Aileen A. Armstrong, Frederick Havard, Fred L. Cornnell, Jr. (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Respondent/Cross–Petitioner in No. 96–2928.

Aileen A. Armstrong, Frederick Havard, Fred L. Cornnell, Jr. (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Peter B. Hoffman, Regional Director, National Labor Relations Board, Region 34, Hartford, CT, for Respondent/Cross–Petitioner in No. 96–3467.

W. James Young, Glenn M. Taubman (argued), National Right To Work Legal Defense Foundation, Springfield, VA, for Intervenors.

Before POSNER, Chief Judge, RIPPLE and EVANS, Circuit Judges.

POSNER, Chief Judge.

We have before us cross-petitions to set aside and to enforce an order by the National Labor Relations Board specifying certain procedures that the machinists' union must or may follow in order to protect the rights of union nonmembers whom the union and its locals represent in collective bargaining with employers. A bit of history will bring the issues into focus. Section 8(a)(3) of the National Labor Relations Act contains a proviso permitting the parties to a collective bargaining agreement to include a "union shop" clause: the employer agrees to require as a condition of employment that the employees in the bargaining unit join the union within thirty days after the collective bargaining agreement goes into effect or, if the employee is hired after the agreement is already in force, within thirty days after he's hired. The Act does not say that the employee thus forced to join the union as a condition of keeping his job can either resign from the union if he objects to the union's political activities or withhold any portion of his dues that is not being used to finance the union's activities on behalf of the members of the bargaining unit. But in dealing with statutes that either regulate public employment or forbid states to ban the union shop (that is, forbid "right to work" laws), and so in either case are taken to place the power of government behind the terms of employment, the Supreme Court has long held that the First Amendment, and so the statutes themselves when interpreted to avoid violating the First Amendment, forbid the employer to require the employee either to remain a union member or to pay any part of the dues that is used to support the union's political activities. *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); see also *Lehnert v. Ferris Fac-*

ulty Ass'n, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991); *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *Brotherhood of Railway & Steamship Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963).

■ Section 8(a)(3) does not regulate the labor relations of public employers or forbid states to ban the union shop. The issue of whether an employer's enforcement of a union-shop clause is nevertheless a governmental act (because of the government's role in encouraging collective bargaining), and is therefore within the purview of the First Amendment, is difficult and remains unresolved. *Wegscheid v. Local Union 2911*, 117 F.3d 986, 988 (7th Cir.1997). But in 1988 the Supreme Court, without reaching the constitutional issue, held that section 8(a)(3) of its own force precludes the employer from requiring workers in the bargaining unit who don't want to be union members to pay any portion of the union dues that is used for activities other than negotiating and administering collective bargaining agreements. All that the employer may require these workers to pay is an "agency fee" representing the portion of the dues that the union expends in its collective bargaining activities. *Communications Workers v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988).

*Beck* left unresolved the definition of the agency function, the design of procedures necessary to allocate union dues between that function and the other activities of a union, and the methods for assuring that workers learn of and are able to exercise their *Beck* rights. Upon the complaint of a number of nonunion members of bargaining units represented by the 800,000–strong machinists' union, the Labor Board in the 125–page opinion that we review today attempted to answer some of the questions left open by *Beck. California Saw & Knife Works*, 320 N.L.R.B. 224, 1995 WL 791959 (1995). The nonunion machinists—we'll call them the "dissenters"—ask us to set aside several provisions of the Board's order and the union asks us to set aside one.

■ The challengers to the Board's order face an uphill fight, for two reasons. The first is that under the doctrine of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Board has broad latitude in interpreting nondirective statutory language. *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 397–99, 116 S.Ct. 1396, 1401, 134 L.Ed.2d 593 (1996); *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987); *Electromation, Inc. v. NLRB*, 35 F.3d 1148, 1156 (7th Cir.1994); *Finerty v. NLRB*, 113 F.3d 1288, 1291 (D.C.Cir.1997). Less directive than section 8(a)(3), so far as agency fees is concerned at any rate, it is scarcely possible to get. The section says nothing about agency fees and so provides no guidance to the formulation of rules governing them. All we have to go on is the Court's holding in *Beck* that the union-shop proviso is intended to prevent workers in a bargaining unit from taking a free ride on the union's efforts in their behalf (the union being required to represent all the members of the unit equally, whether or not they are union members). The free ride is prevented by making the nonmembers pay their aliquot share of the union's cost of representing the workers in the unit—but no more. All the details necessary to make the rule of *Beck* operational were left to the Board, subject to the very light review authorized by *Chevron*. It is hard to think of a task more suitable for an administrative agency that specializes in labor relations, and less suitable for a court of general jurisdiction, than crafting the rules for translating the generalities of the *Beck* decision (more precisely, of the statute as authoritatively construed in *Beck*) into a workable system for determining and collecting agency fees.

The posture of this case, moreover, makes judicial review necessarily abstract, and as a result limited in depth. In the wake of *Beck*, the machinists' union adopted the procedures that were before the Board in this case. The Board evaluated these procedures not in terms of their actual operation, evidence of which was not placed before the Board, but in terms of their conformity to the general

norm of reasonableness that is implicit in the concept of "fair" representation. *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 78, 111 S.Ct. 1127, 1135–36, 113 L.Ed.2d 51 (1991); *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953); *Trnka v. Local Union No. 688,* 30 F.3d 60 (7th Cir.1994); *Young v. UAW–LETC,* 95 F.3d 992, 996–98 (10th Cir.1996). The briefs do not even tell us the average annual dues of a member of the machinists' union or the percentage of those dues that is represented by the agency fee, though we were told at argument that the first number is about $300 a year and the second about 85 percent. There is no evidence about actual mistakes in the calculation of the agency fee or actual confusion of workers about their rights under *Beck.* The challengers thus face the difficult task of persuading us without the aid of facts that the Board was unreasonable in determining that some of the union's procedures are reasonable and others (one challenged here) unreasonable, regardless of their actual administration and effect. Nothing in this opinion is intended to prejudge any challenge to the Board-approved procedures that is based on how they operate in practice rather than in the realm of hope and speculation.

■ The dissenters' first challenge is to the Board's allowing the union to pool all its expenditures (including litigation expenditures, treated separately by the parties but analytically identical, as far as we can see) relating to collective bargaining, and in effect divide the pool by the number of workers that the union represents, to compute the basic agency fee. The dissenters argue that this component of the fee should be limited to the expenses incurred by the union in representing their units, not other units of workers, let alone workers in another country (Canada), where the machinists' union represents some workers in collective bargaining. The argument overlooks the economic interdependence of bargaining units. Imagine two competing employers of machinists. One has a collective bargaining agreement with the machinists' union that is about to expire; the other does not yet have a collective bargaining agreement with the union although the union is the exclusive bargaining representative of the employer's machinists. The union's ability to extract higher wages from the first employer will be constrained by the competition of the second employer, who may be paying lower wages and thus incurring lower operating costs. It is therefore in the interest of the machinists in the first firm, including those who do not belong to the union, that the union succeed in negotiating an advantageous collective bargaining agreement for the competing firm's machinists. The costs that the union incurs in that effort generate benefits to the nonmember machinists and are therefore a permissible component of the agency fee, even though the union's efforts are directed at a different employer.

We made our example an easy one for the Board by stipulating that the different employers were competing. Often they will not be. They may still be competing for workers, even though their products are not competitive; but then again they may not be. And even in the easy cases, quantification of the benefits to the workers in one bargaining unit from a worker-favorable collective bargaining agreement in another would be impossible as a practical matter. Given the difficulties, aggregation is the only feasible alternative to ignoring interdependence altogether. Faced with such a choice, a classic case of having to choose the lesser of two evils on insufficient information, the Board's decision cannot be deemed unreasonable. *Lehnert v. Ferris Faculty Ass'n, supra,* 500 U.S. at 522–24, 111 S.Ct. at 1960–62; *Finerty v. NLRB, supra,* 113 F.3d at 1291–92. If, moreover, the actual interdependence of units of machinists is so slight as to make the pooling of the expenses of all the different ones unreasonable, this is something to be shown in a challenge to the *application* of the principle of pooling, and no issue of application was before the Board or is before us. Only the principle itself is at issue, and pooling is not unreasonable at the level of principle.

■ The dissenters' next complaint is about the method by which the international union audits the calculation of the agency fee by the locals and the districts (the districts being intermediate bodies between the locals

and the international). Rather than hiring a certified public accountant to do the audits, the international assigns auditors who are employed by it or one of the subordinate bodies, but who are not CPAs and may have no formal training in accounting, to audit the agency-fee calculations of a local or district with which the particular auditor has no present or prior affiliation. As all the auditors are the employees of an affiliate of the audited entity, they do not have the formal independence, let alone the training or certification, of accountants who are hired to audit the books of substantial corporations but are not actually the employees of those corporations.

This is another area where the difference between abstract and concrete judicial review bites. The machinists' auditors may be so biased or so unskilled that they make many mistakes, most no doubt favoring the union. But of this there is as yet no evidence, so we are left to speculate on the likelihood and direction of error under the informal system that the Board has approved. CPAs are costly, so much so that Congress in passing the Landrum–Griffin Act rejected a proposal to require that the reports of union financial activities that the Act requires be made to union members and regulatory bodies be audited by independent CPAs. See H.R. 4473, §§ 102(b)(10), 211(b), reprinted in 1 *Legislative History of the Labor–Management Reporting and Disclosure Act of 1959* 193, 237 (1959); Hearings on H.R. 4473 and Related Bills, Joint Subcomm. of the Comm. on Education & Labor, 86th Cong., 1st Sess., vol. 2, pp. 982–92 (May 5, 1959). We do not put much weight on this history, given the general difficulty of inferring legislative intent from rejected bills and materials in hearings and the fact that the rejected proposal would have required CPA audits of reports by unions to their members, not to dissenters, whose rights were not yet well recognized in the law. Still, we do not think it can be thought *unreasonable*, as distinct from questionable or even incorrect, for the Board to experiment with allowing the machinists' union to use the cheaper informal method of auditing the locals' and the districts' calculations of the agency fee.

The D.C. Circuit reached the opposite conclusion in *Ferriso v. NLRB*, 125 F.3d 865 (D.C.Cir.1997), primarily in reliance on the *Hudson* decision, in which the Supreme Court had suggested in a footnote that the union must verify the agency-fee information that it gives the workers by an *independent* audit. *Chicago Teachers Union v. Hudson, supra,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. *Hudson* was a constitutional case; it involved the First Amendment rights of public employees, not the statutory rights of workers covered by the National Labor Relations Act. It is not obvious why this should make a difference, however; in either case the worker is entitled to reliable information about the costs of representation, which are the only costs that he is legally obligated to pay. More important is the fact that *Hudson* does not specify what an "independent" audit means. It does not say that the auditor must be a CPA or have no affiliation with the audited union. Decisions before *Ferriso* had assumed that either or both features must be present. E.g., *Hohe v. Casey,* 956 F.2d 399, 415–16 (3d Cir.1992); *Tierney v. City of Toledo,* 824 F.2d 1497, 1506 (6th Cir.1987); *Tierney v. City of Toledo,* 917 F.2d 927, 933–36 (6th Cir.1990). But none of the cases consider alternatives. And they are in tension with the cases (often the same cases!) that hold that dissenters are not entitled to the highest level of audit services that the market offers. E.g., *Ferriso v. NLRB, supra,* 125 F.3d at 871; *Gwirtz v. Ohio Education Ass'n,* 887 F.2d 678, 680–82 (6th Cir. 1989). One way in which an audit service might not be of platinum quality is in not being performed by a formally independent auditor or CPA.

■ "Independence" is a slippery term once it is given a functional rather than merely a formal signification. The auditors in the present case have an indirect affiliation with the audited local but are not employed by the local, and it could be argued that an independent auditor hired by the local would actually feel a greater sense of obligation to the local as the entity paying its bills. Realistically, an accountant is not completely "independent" of its client, because while the client wants to have an accurate picture of its financial health, it also wants the accountant

to exercise all possible discretionary judgment in favor of presenting a picture of the client's finances that will further the client's goals, whether they are to maximize share value or minimize taxes or borrowing costs or other obligations. It is within the Board's discretion to decide whether, all things considered, the system adopted by the machinists' union is an acceptable alternative to a system in which the local would hire an independent accounting firm to audit its books. (Because in disagreeing with the *Ferriso* decision we are creating an intercircuit conflict over the issue of the "independent" auditor, this opinion was circulated to the full court for a vote on whether to grant rehearing en banc in advance of decision. 7th Cir. R. 40(e). There were no votes to grant rehearing.)

■ The dissenters' last challenge is to the Board's ruling that while new hires must receive a letter informing them of their *Beck* rights, it is enough so far as existing employees are concerned to include a notice of the rights in the December issue of *The Machinist*. This is a monthly newsletter published by the union and mailed to all workers, union and nonunion alike, employed in units represented by the machinists' union or one of its locals. The newsletter is "free" to union members (that is, their dues pay for it), but lists a subscription price of $4. Whether the union tries to collect the price from nonmembers we do not know, although the fact that it is mailed to all workers in all the bargaining units represented by the union suggests not—but maybe it's included in the agency fee. The dissenters have made no issue of the price, so neither shall we.

In the December 1991 issue, which we take to be representative, the right-hand column on the sixth page of the eight-page newsletter is occupied by a notice that explains in considerable detail that a worker who doesn't want to belong to the union can pay an agency fee in lieu of union dues upon request made by the end of the next month (January 1992). The first page of the newsletter is largely occupied by an article about Democratic Presidential hopefuls vying for union support and there are a number of other political articles in the issue, all with a strong

Democratic bias. The dissenters argue that "burying" the notice inside this Democratic rag is hardly calculated to inform workers who disagree with the union's politics and ideology of their right to opt out of the union and union dues.

This may be right, but once again we cannot say that the Board acted unreasonably in finding to the contrary, especially in the absence of evidence that the notice in the December issue of *The Machinist* is ineffectual. The Board could reasonably—we do not say correctly; that is not the issue for us—find that since the newsletter contains articles of interest to all machinists, whether or not they have any interest in politics or for that matter in the union, it is quite likely to be read by them. The notice of *Beck* rights is not buried; it occupies almost half of one page in a newsletter that is only eight pages long, making it hard to miss. And the machinists undoubtedly have other sources of information about their *Beck* rights besides the union newsletter. The adequacy of the unions' compliance with *Beck* has been a hot political issue for years, and the National Right to Work Foundation has been active in encouraging workers to assert their *Beck* rights.

Notice by publication is generally considered improper when individual notice (normally by mail) is feasible. E.g., *Elmco Properties, Inc. v. Second National Federal Savings Ass'n*, 94 F.3d 914, 920–21 (4th Cir. 1996). In this case, however, the publication containing the notice was *personally* sent to all the people potentially affected by it. The difference need not be dispositive. We do not wish to suggest that the act of subscribing to the daily newspaper places the subscriber on notice of every announcement in it. But we are dealing with a special-interest newsletter, with an announcement that occupies a nontrivial fraction of the total space in the newsletter, and with dissemination in a context in which recipients have other sources of information concerning a controversial issue that affects their welfare directly. Even so, we do not hold that this form of notice is adequate in fact. That is not the question for us. The question for us is whether the Board can be said to have

been acting unreasonably in finding that this form of notice was adequate in the circumstances, and our answer is "no." The Board knows more about the flow of information in labor markets than judges do. And were we to reject the Board's finding, we would entangle ourselves in excessively particularistic inquiries into the details of the notification process. Would we have to edit the notice to make it clearer? Require that it be in larger type? Specify **bold face** or CAPS? Insist that it be put on the front page? Insist that it be put in a letter mailed to every machinist once a year—or twice a month? Without a strong conviction of the inadequacy of the existing notice, a conviction difficult to form without evidence that any machinist has failed to learn of his rights, we are unwilling to embark on such an uncharted sea in quest of a phantom of perfect information.

■ We take up last the union's challenge to the rejection by the Board of the "window" provision of the union's procedure for complying with *Beck*. Under that provision a machinist who is a member of the union and has been paying his full dues, decides to quit, but fails to opt out of paying full dues during the January "open season" must wait until the beginning of the next year to opt out. (Newly hired employees, or employees newly covered by union-shop clauses, do not have to wait to opt out.) The employee's resignation from the union is effective immediately, but not his switch from paying union dues to the lower agency fee. The Board invalidated this provision, holding that the worker is entitled to switch to paying the lower amount as soon as he resigns. In a private case against the machinists' union (as distinct from the present case, in which the Board is the respondent), we held, in favor of the union, that the window procedure is reasonable and that its invalidation would place an undue administrative burden on the union. *Nielsen v. International Ass'n of Machinists*, 94 F.3d 1107, 1116–17 (7th Cir.1996). The Board was not a party to *Nielsen* and did not participate in the case in any fashion, and our opinion did not discuss the possible bearing of the *Chevron* doctrine for the simple reason that neither party argued it to us. *California Saw*, the order under review in this case in which the Board invalidated the window provision, was decided after the oral argument in *Nielsen*. We criticized the Board's position but did not purport to decide in advance the appeal that is now before us. Now that all affected parties, notably the Board itself, have had a full opportunity to present their positions in this appeal from the order in *California Saw* explicitly within the framework of the *Chevron* doctrine, we are persuaded that the Board must be upheld. *Nielsen* did not purport to rule in advance on *California Saw*, invalidating the Board's order before it was challenged; it held only, in the context of a private litigation, that the union had not in 1993 violated its duty of fair representation by failing to implement the Board's later adopted rule in *California Saw*. Now that the Board has established and defended its position, normal *Chevron* analysis is the order of the day.

■ It is no doubt true that changing the method of billing the worker midyear is a bother for the union. But how big a bother depends on such things as the number of changes and the cost and flexibility of the union's system of accounting, billing, and mailing. In the absence of evidence (to repeat for the last time the refrain of this opinion), we cannot say that the Board, balancing the needs of the union against the interests of workers wishing to exercise their rights under *Beck*, acted unreasonably. Nor is there any reason to suppose this Board insensitive to the legitimate interests of unions in avoiding the costs of cumbersome procedures; on the contrary, that sensitivity is apparent throughout the Board's order, notably in its permitting pooling. All this is not to say that *Nielsen* was incorrect. Its rule may be the better one. But deferential review of agency action implies that a court may have to uphold a rule that it would not have adopted as an original matter. In *Nielsen*, a private case, we were asked to use our judgment and apply the best rule to circumstances that had occurred several years before the Board acted. In the present case we are asked to strike down the Board's rule, and we can do that only if convinced not that it is incorrect but that it is unreasonable.

And for the reasons that we have set forth we cannot say that.

The petitions for review are denied and the cross-application to enforce the Board's order is granted in its entirety.

ENFORCEMENT GRANTED.

EVANS, Circuit Judge, concurring.

I join Chief Judge Posner's splendid opinion in all respects and write separately merely to emphasize my view that the Board's rejection of the union's January opt-out window is no more than a hair away from being unreasonable. Only our deferential review, required by *Chevron,* sanctions the rock the Board has tossed through the window.

In *Nielsen,* we explained why it is reasonable for a union to employ a window period for former members switching over to an agency fee. Although *Nielsen,* as Chief Judge Posner notes, arose in a slightly different setting, we nevertheless observed there that "[l]ife is full of deadlines, and we see nothing particularly onerous about this one." 94 F.3d at 1116. We went on to observe, by way of an example, that when people miss the deadline for filing an appeal with us their rights are lost forever, not just for a few months.

As with litigants, Article III judges live with action windows. The last monthly "employee earnings statement" for 1997 received from the Administrative Office of the United States Courts warned every federal judge in America that:

> THE ANNUAL FEDERAL EMPLOY-EES HEALTH BENEFITS OPEN SEASON BEGAN ON NOVEMBER 10, 1997 AND WILL END ON DECEMBER 8, 1997.

> THE TSP [Thrift Savings Plan] OPEN SEASON BEGAN ON NOVEMBER 15, 1997 AND WILL END ON JANUARY 31, 1998.

Given the overwhelming acceptance of deadlines and window periods analogous to the one in this case, it is baffling to me why the Board looked with disfavor on the union's position. I think it's a shame that *Chevron* prevents us from rejecting the Board's view.