United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 7, 2000 Decided February 22, 2000 

 No. 99-1121

 Robert Penrod, et al., 
 Petitioners

 v.

 National Labor Relations Board, 
 Respondent

 International Brotherhood of Teamsters, Local 166, 
 Intervenor

 On Petition for Review of an Order of the 
 National Labor Relations Board

 Glenn M. Taubman argued the cause and filed the briefs 
for petitioners.

 Jill A. Griffin, Attorney, National Labor Relations Board, 
argued the cause for respondent. With her on the brief were 
Linda Sher, Associate General Counsel, Aileen A. Armstrong, 
Deputy Associate General Counsel, and Peter D. Winkler, 
Supervisory Attorney. John D. Burgoyne, Deputy Associate 
General Counsel, entered an appearance.

 James B. Coppess argued the cause for intervenor. With 
him on the brief was Gary S. Witlen.

 Before: Williams, Randolph and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Concurring opinion filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: This petition to review a decision of 
the National Labor Relations Board requires us to consider 
what information a union's duty of fair representation re-
quires it to give employees about their right under Communi-
cations Workers of America v. Beck, 487 U.S. 735 (1988), to 
pay only that portion of union dues attributable to "collective 
bargaining, contract administration, and grievance adjust-
ment." Id. at 745. The Board held that unions have no 
obligation to tell employees who have not yet exercised their 
Beck rights what percentage of dues are spent on nonrepre-
sentational activities. The Board also ruled that the union in 
this case had given employees who had chosen to exercise 
their Beck rights sufficient information to satisfy its duty of 
fair representation. Finding a portion of the Board's decision 
unsupported by reasoned decisionmaking and the remainder 
in conflict with Supreme Court and circuit precedent, we 
grant the petition for review.

 I

 Section 8(a)(3) of the National Labor Relations Act gives 
unions the right to negotiate union security provisions allow-
ing them to collect dues from all members of a bargaining 
unit, including those who decline full union membership. 29 
U.S.C. s 158(a)(3); Marquez v. Screen Actors Guild, Inc., 119 

S. Ct. 292, 296 (1998). Employees who choose not to become 
full union members are called "financial core" payors. See 
NLRB v. General Motors Corp., 373 U.S. 734, 742 (1963). In 
Beck, the Supreme Court held that section 8(a)(3) does not 
obligate employees "to support union activities beyond those 
germane to collective bargaining, contract administration, and 
grievance adjustment." 487 U.S. at 745. Unlike full union 
members and financial core payors, employees who object to 
funding nonrepresentational activities, called "Beck objec-
tors," pay reduced dues. Beck objectors are also known as 
"potential challengers" because they have a right to challenge 
the union's calculation of the reduced dues; in response to 
such challenges, the union bears the burden of justifying its 
calculation. See California Saw & Knife Works, 320 NLRB 
224, 240 (1995).

 Petitioners Robert Penrod, Nadine Penrod, and Clement 
Wierzbicki, long-time employees of DynCorp Support Ser-
vices Operations, resigned from their union, International 
Brotherhood of Teamsters, Local 166, and exercised their 
Beck rights. Petitioner John Burnham never became a full 
member of the union, instead informing Local 166 shortly 
after being hired that he wished to be a financial core payor.

 Having received no information from Local 166 about their 
Beck rights, all four petitioners filed unfair labor practice 
charges against the union. Pursuant to an agreement set-
tling these charges, Local 166 promised to give all new 
employees and financial core payors initial Beck notices out-
lining their Beck rights and describing how to exercise them. 
The union also sent letters to the Beck objectors informing 
them that they must pay 93.6 percent of union dues and 
describing procedures for challenging that calculation. At-
tached was a letter from an independent auditor confirming 
the accuracy of the reduced fee calculation. The auditor in 
turn attached a handwritten worksheet listing nineteen cate-
gories of expenditures, such as "salaries," "benefits paid," 
"legal expenses," and "auto expenses." For each expenditure 
category, the auditor identified the amount and percentage 

"chargeable" and "nonchargeable" to Beck objectors. The 
worksheet referred to a "breakdown" and to "schedules," but 
they were not attached. The auditor's worksheet is attached 
to this opinion as Appendix A.

 Complaining that the information furnished by Local 166 
and its auditor was inadequate, petitioners renewed their 
unfair labor practice charges. In response, the NLRB's 
General Counsel filed a formal complaint charging Local 166 
with failing to include in the initial Beck notice the percentage 
by which dues would be reduced for new employees and 
financial core payors who exercise their Beck rights. The 
General Counsel also charged that the financial information 
given to Beck objectors was "too vague to permit each of 
these employees to decide whether to challenge any of the 
expenditures listed in the Statement of Expenses."

 The Board rejected the General Counsel's charges. Inter-
national Bhd. of Teamsters, Local 166, AFL-CIO, 327 NLRB 
No. 176 (1999). Although agreeing that the duty of fair 
representation required Local 166 to provide initial Beck 
notices to new employees and financial core payors, the Board 
determined that the union had not violated its duty by failing 
to include the percentage by which dues would be reduced. 
Citing the time and expense needed to make such calcula-
tions, and explaining that the duty of fair representation 
affords unions a "wide range of reasonableness," the Board 
concluded that the decision to furnish the percentage was a 
"judgment call" within the union's discretion. Id., slip op. at 
3. With respect to employees who had exercised their Beck 
rights, the Board found that the auditor's information was 
sufficient for them to determine whether to challenge the 
reduced fee calculation. Id., slip op. at 4-5.

 Petitioners challenge the Board's decision on three 
grounds. The first two concern the information given Beck 
objectors. The one-page handwritten list of expenditures, 
they say, neither explained nor justified the union's determi-
nation that Beck objectors would be required to pay 93.6 
percent of dues. Their second challenge focuses on the 

approximately twenty-five percent of total expenditures that 
Local 166 paid to its affiliates. See Appendix A. The third 
challenge relates to new employees and financial core payors; 
according to petitioners, such employees are entitled to know 
the precise amount by which their dues would be reduced 
were they to exercise their Beck rights. Local 166, defending 
the Board's conclusion that it satisfied its duty of fair repre-
sentation, has intervened.

 II

 Grounded in section 9(a) of the NLRA, 29 U.S.C. s 159(a), 
the judicially created duty of fair representation reflects the 
principle that a union's status as exclusive representative of 
employees in a bargaining unit "includes a statutory obli-
gation to serve the interests of all members without hostility 
or discrimination toward any, to exercise its discretion with 
complete good faith and honesty, and to avoid arbitrary 
conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967). Unions 
breach their duty of fair representation when their conduct 
toward members of a bargaining unit is "arbitrary, discrimi-
natory, or in bad faith." Id. at 190.

 The Supreme Court fleshed out the duty of fair representa-
tion in the Beck context in Chicago Teachers Union, Local 
No. 1, AFT, AFL-CIO v. Hudson, 475 U.S. 292 (1986). In 
that case, the Court established procedures that unions must 
follow to protect objectors and described the financial infor-
mation that unions must give to potential objectors. "Basic 
considerations of fairness, as well as concern for the First 
Amendment rights at stake," the Court held, "dictate that the 
potential objectors be given sufficient information to gauge 
the propriety of the union's fee." Id. at 306. While Hudson 
involved public employees and arose under the First Amend-
ment, this circuit has applied its requirements to nonpublic 
unions such as Local 166. See, e.g., Abrams v. Communica-
tions Workers of America, 59 F.3d 1373, 1379 n.7 (D.C. Cir. 
1995). With this framework in mind, we turn to petitioners' 
three challenges.

 General Disclosure to Beck Objectors

 With respect to their first claim--that the list of nineteen 
expenditure categories was insufficient to allow them to de-
termine whether to challenge the reduced fee calculation--
petitioners complain that the single sheet "contains no notes 
or other written explanation concerning how that union's 
overall 93.6% chargeable, 6.4% nonchargeable calculation was 
made." That lack of explanation, petitioners contend, was 
compounded by the "vague and unexplained" line items and 
the absence of referenced schedules and breakdowns.

 The Board ruled that the Beck objectors had no need for 
schedules, breakdowns, or better-defined categories of ex-
penses to determine whether to challenge the reduced dues 
calculation. Addressing the Beck objectors' most fundamen-
tal argument--that the single page of financial information 
failed to explain how the union arrived at its 93.6 percent 
chargeable figure--the Board relied entirely on a decision of 
the Seventh Circuit, Gilpin v. American Fed'n of State, 
County, and Mun. Employees, AFL-CIO, 875 F.2d 1310, 
1316 (7th Cir. 1989): "As the Seventh Circuit Court of 
Appeals has remarked in response to the same kind of 
argument, 'if it did [include the disclosure petitioners request-
ed], the notice would be as long and complicated as an SEC 
prospectus.' The court discerned no reason for imposing 
such a requirement, and neither do we." 327 NLRB No. 176, 
slip. op. at 5 (citing Gilpin, 875 F.2d at 1316).

 The union's disclosure in Gilpin was more extensive than 
Local 166's. In addition to listing thirty-five different types of 
expenditures (comparable to the nineteen categories provided 
by Local 166), the notice in Gilpin identified thirty-five 
specific union activities, indicating for each whether the union 
considered it "wholly chargeable," "wholly unchargeable," or 
"mixed." Gilpin, 875 F.2d at 1316. For example, the notice 
identified publishing a union newsletter as "mixed" and ad-
justing grievances as "wholly chargeable." Id. For a pay-
ment of $1.50, each employee could also obtain an arbitrator's 
"detailed ruling" said to sustain the union's expense alloca-

tions. Id. According to the Seventh Circuit, this information 
"should be enough ... to allow the employee to decide 
whether there is any reason to mount a challenge." Id.

 By comparison, the Beck objectors in this case were given 
only general categories of expenditures. See Appendix A. 
To be sure, two of these categories--"contributions" and 
"organizing"--were quite specific, but both were totally "non-
chargeable." The union offered no separate list of activities, 
nor provided any opportunity to obtain a detailed explanation 
of how the union calculated the allocation of expenses. In 
addition, the Beck objectors never received the "schedules" 
and "breakdown" said to be attached to the auditor's report.

 The information provided in Gilpin, as the Seventh Circuit 
found, gave objectors a basis for objecting to the union's 
calculation of reduced dues. For example, they could have 
reviewed the newsletter and made their own judgment about 
whether to challenge the union's determination that newslet-
ter costs were partially chargeable. Could Beck objectors in 
this case have made a similar judgment about the general 
categories of expenditures supplied by the auditor? For 
example, how could they have evaluated the union's determi-
nation that "salaries" were partially chargeable to Beck objec-
tors in view of the fact that the only other information they 
were given about salaries was the gross amount? Instead of 
answering this question, the Board simply cited Gilpin as 
though the case dealt with the same type of disclosure. 
Because it did not, we think the Board's decision reflects a 
classic case of lack of reasoned decisionmaking. See Macmil-
lan Publishing Co. v. NLRB, 194 F.3d 165, 168 (D.C. Cir. 
1999) (The Regional Director's "rationale was the antithesis of 
reasoned decisionmaking, and as such was arbitrary and 
capricious.") (citing Motor Vehicles Mfrs. Ass'n v. State Farm 
Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

 Information about Payments to Affiliates

 Petitioners' second complaint about the union's financial 
disclosure focuses on the information about Local 166's pay-
ments to affiliated unions. Representing almost twenty-five 
percent of the union's total expenditures, payments to affili-
ates were 90.8 percent chargeable to Beck objectors. See 
Appendix A. In addition to arguing that Local 166 should 
have explained this calculation, petitioners claim that they are 
entitled to know which affiliates received funds and how those 
affiliates used those funds. They rely on the following lan-
guage from Hudson: "[E]ither a showing that none of [the 
money paid to affiliates] was used to subsidize activities for 
which nonmembers may not be charged, or an explanation of 
the share that was so used was surely required." 475 U.S. at 
307 n.18.

 In concluding that Local 166's disclosure was adequate, the 
Board distinguished Hudson: "In that case, the union paid 
more than half its income to affiliated organizations, but 
informed nonmembers only that they were required to pay 95 
percent of full dues. It did not inform them of the basis on 
which it was charging them that amount or, apparently, 
anything regarding how the amounts transferred to affiliates 
were spent or what percentages were chargeable and non-
chargeable." 327 NLRB No. 176, slip. op. at 5.

 The Board's basis for distinguishing Hudson is curious. To 
begin with, two of the deficiencies in the Hudson notice that 
the Board said made Hudson different from this case were 
also deficiencies in Local 166's disclosure. The union in 
Hudson, the Board said, "did not inform [the employees] of 
the basis on which it was charging them that amount or, 
apparently, anything regarding how the amounts transferred 
to affiliates were spent." Id. Yet this is precisely the 
information that Local 166 failed to provide and that petition-
ers seek in this case.

 So the Board's conclusion that Hudson differs from this 
case boils down to two distinctions. In Hudson, the union 
spent fifty percent of its budget on affiliates; here, it spent 
twenty-five percent. In Hudson, the union failed to identify 

the percentage of payments to affiliates chargeable to Beck 
objectors; here, the union said such payments were ninety 
percent chargeable. Nothing in Hudson suggests that the 
level of required disclosure turns on such factors. Hudson's 
directive is quite simple: unless a union demonstrates that 
"none of [the amount paid to affiliates] was used to subsidize 
activities for which nonmembers may not be charged," then 
"an explanation of the share that was so used [is] surely 
required." 475 U.S. at 307 n.18. Because Local 166 disclosed 
that over ninety percent of the amount paid to its affiliates 
was chargeable to Beck objectors, Hudson requires that the 
union explain how its affiliates used the money.

 Initial Notice to New Employees 
 and Financial Core Payors

 This brings us to petitioners' challenge to the Board's 
ruling that the initial Beck notice given to new employees and 
financial core payors need not identify the percentage reduc-
tion in dues that would result from a Beck objection. Ex-
plaining its decision, the Board observed that calculating the 
reduced fee "can be an expensive and timeconsuming under-
taking" and emphasized the "wide range of reasonableness" 
afforded unions in serving the employees they represent. 327 
NLRB No. 176, slip op. at 3. We need not consider whether 
to defer to such reasoning, for this issue is squarely con-
trolled by Hudson as interpreted by this court in Abrams.

 In Hudson, the Supreme Court held that "[b]asic consider-
ations of fairness, as well as concern for the First Amend-
ment rights at stake, also dictate that the potential objectors 
be given sufficient information to gauge the propriety of the 
union's fee." 475 U.S. at 306. Abrams expressly applies 
Hudson's requirements to new employees and financial core 
payors. 59 F.3d at 1379. Since Hudson requires that poten-
tial objectors be told the percentage of union dues chargeable 
to them--for how else could they "gauge the propriety of the 
union's fee"--and since Abrams applies Hudson to new em-
ployees and financial core payors, they too must be told the 

percentage of union dues that would be chargeable were they 
to become Beck objectors.

 The Board and Local 166 nevertheless insist that Hudson 
applies only to employees who have elected to exercise their 
Beck rights, not to new employees and financial core payors. 
But Abrams could not have been clearer. Like the Board 
and Local 166, the dissent in Abrams argued that Hudson's 
requirements do not apply to new employees and financial 
core payors. Abrams, 59 F.3d at 1383-84 (Tatel, J., concur-
ring in part and dissenting in part). Abrams ruled to the 
contrary: "The dissent takes issue with our interpretation of 
Hudson but the quoted language makes clear that potential 
objectors must be given adequate notice. Although the Su-
preme Court addressed the issue in the context of 'informa-
tion about the basis for the proportionate share' of financial 
core expenses, the same 'basic considerations of fairness' 
necessarily extend to a union's notice to workers of their right 
to object to payment of any expenses beyond the financial 
core." Abrams, 59 F.3d at 1379 n.6 (internal citation omit-
ted).

 The Board and Local 166 point out that Abrams concerned 
the wording of the initial Beck notice, not whether the union 
must disclose the percentage reduction. In order to conclude 
that the wording was inadequate, however, Abrams had to 
hold that Hudson applies to new employees and financial core 
payors, and Hudson carries with it the requirement that 
unions give employees "sufficient information to gauge the 
propriety of the union's fee"--i.e., the percentage reduction 
(see supra at 9). 475 U.S. at 306. We recognize that this 
means that new employees and financial core payors must be 
given the same information as Beck objectors, but Abrams is 
the law of this circuit.

 Petitioners challenge the initial Beck notice for a second 
reason. They contend that the initial notice must not only 
identify the amount of the reduced fee but also explain the 
method used to calculate the fee. According to the Board, 
petitioners failed to raise this issue before the Board and so 

cannot raise it for the first time on appeal. We agree with 
the Board.

 The two record excerpts petitioners point to--a paragraph 
in the petitioners' final unfair labor practice charge and three 
paragraphs in the General Counsel's fourth amended com-
plaint--cannot fairly be read to raise the issue. Both refer 
only to the financial information designed for Beck objectors, 
not to the initial Beck notice given to new employees and 
financial core payors. Rejecting petitioners' contention that 
the method of calculation is "implicit" in the issue of disclo-
sure of the fee itself, we conclude that we may not consider 
petitioners' claim that the initial Beck notice must include an 
explanation of the method used to calculate the fee. See 29 
U.S.C. s 160(e) ("No objection that has not been urged before 
the Board ... shall be considered by the court, unless the 
failure or neglect to urge such objection shall be excused 
because of extraordinary circumstances."); Harter Tomato 
Prods. Co. v. NLRB, 133 F.3d 934, 939 (D.C. Cir. 1998).

 III

 The petition for review is granted, and this case is remand-
ed to the Board for proceedings consistent with this opinion.

 So ordered.

 APPENDIX A

 NOT AVAILABLE ELECTRONICALLY

 Tatel, J., concurring: I dissented in Abrams because I saw 
nothing in Hudson that required its application to new em-
ployees and financial core payors. Abrams, 59 F.3d at 1383-
84 (Tatel, J., concurring in part and dissenting in part). This 
case demonstrates the consequences of Abrams: judicial 
usurpation of the Board's traditional authority to determine 
national labor policy.

 To protect employees' Beck rights, the Board has crafted a 
three-step process, calibrating the nature and amount of 
information that unions must give employees to the decision 
they must make at each stage. New employees and financial 
core payors receive an initial Beck notice informing them of 
their Beck rights and how to exercise them. See California 
Saw & Knife Works, 320 NLRB at 233. Beck objectors are 
told the amount of the reduced dues as well as how that 
amount was calculated. See id. Beck objectors who chal-
lenge the union's calculation receive still more information, 
with the union bearing the burden of proving the accuracy of 
its calculation. See id. at 240. Balancing employees' need for 
information against the burden on unions of providing the 
information, this process reflects the Board's application of 
the duty of fair representation in the Beck context.

 Consistent with this approach, the Board held in this case 
that unions were not required to disclose to new employees 
and financial core payors the percentage by which their dues 
would be reduced were they to exercise their Beck rights. 
Not only does the Board believe that new employees and 
financial core payors have no need for this information to 
decide whether to exercise their Beck rights, but it concluded 
that providing the information would be an "expensive and 
timeconsuming undertaking." International Bhd. of Team-
sters, Local 166, 327 NLRB No. 176, slip. op. at 3. Whether 
to disclose the percentage is a "judgment call," within the 
"wide range of reasonableness" afforded unions in carrying 
out their duty of fair representation, the Board found. Local 
166's failure to disclose the percentage was not "arbitrary, 
discriminatory, or in bad faith." Id.

 Absent Abrams, we would evaluate the Board's reasoning 
pursuant to a highly deferential standard. See Ferriso v. 
NLRB, 125 F.3d 865, 869 (D.C. Cir. 1997). Yet as our 

opinion in this case demonstrates, Abrams' extension of Hud-
son to new employees and financial core payors has foreclos-
ed us from considering the Board's rationale at all, requiring 
that we ignore not just our traditional deference to the Board, 
but also the "wide range of reasonableness" afforded unions 
in satisfying their duty of fair representation. See Marquez, 
119 S. Ct. at 300. "It is hard to think of a task more suitable 
for an administrative agency that specializes in labor rela-
tions, and less suitable for a court of general jurisdiction, than 
crafting the rules for translating the generalities of the Beck 
decision ... into a workable system for determining and 
collecting agency fees." International Ass'n of Machinists & 
Aerospace Workers v. NLRB, 133 F.3d 1012, 1015 (7th Cir. 
1998). By commandeering a judgment that should have been 
left to the Board's expertise, Abrams has produced a result 
that I doubt Hudson intended.